1 | DANIEL G. BOGDEN
United States Attorney
2 | STEVEN W. MYHRE
NICHOLAS D. DICKINSON
3 | Assistant United States Attorneys
NADIA J. AHMED
4 | ERIN M. CREEGAN
Special Assistant United States Attorneys
5 | 333 Las Vegas Blvd. South, Suite 5000
Las Vegas, Nevada 89101
6 | PHONE: (702) 388-6336
FAX: (702) 388-6698

7 |

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

8 |

UNITED STATES OF AMERICA,           )
9 |                                   )
      Plaintiff,                     ) **CRIMINAL COMPLAINT**
10 |                                  )
     v.                           ) Case No.: **2:16-mj-000127-PAL**
11 |                                  )
CLIVEN D. BUNDY,                    ) **VIOLATIONS:**
12 |                                  )
     Defendant.                     ) 18 U.S.C. § 371 – Conspiracy to Commit
13 |                                  ) An Offense Against the United States;
                                    )
14 |                                  ) 18 U.S.C. § 111(b) – Assault on a Federal
                                    ) Law Enforcement Officer;
15 |                                  )
                                    ) 18 U.S.C. § 924(c) – Use and Carry of a
16 |                                  ) Firearm In Relation to a Crime of
                                    ) Violence;
17 |                                  )
                                    ) 18 U.S.C. § 1503 – Obstruction of the
18 |                                  ) Administration of Justice;
                                    )
19 |                                  ) 18 U.S.C. § 1951 – Interference with
                                    ) Commerce by Extortion;
20 |                                  )
                                    ) 18 U.S.C. § 2 – Aiding and Abetting
21 |                                  )
                                    )
22 |                                  )
                                    )
23 |                                  )
                                    )
24 |                                  )

**BEFORE** the United States Magistrate Judge, Las Vegas, Nevada, Joel P. Willis, Special Agent, Federal Bureau of Investigation, Complainant herein, being first duly sworn deposes and states as follows:

## COUNT ONE
Conspiracy to Commit an Offense Against the United States
(Title 18, United States Code, Section 371)

Beginning in at least March 2014 and continuing to on or about the date of this Complaint, in the State and Federal District of Nevada and elsewhere,

### CLIVEN D. BUNDY,

defendant herein, did conspire, confederate, and agree with others to commit an offense against the United States, to wit:

a.      Assault on a Federal Officer, in violation of Title 18, United States Code, Sections 111(a)(1) and (b);

b.      Use and Carry a Firearm During and In Relation to a Crime of Violence, in violation of Title 18, United States Code, Section 924(c);

c.      Interference with Commerce by Extortion, in violation of Title 18, United States Code, Section 1951; and

d.      Obstruction of the Administration of Justice, in violation of Title 18, United States Code, Section 1503.

In furtherance of the conspiracy, defendant **BUNDY** and other members of the conspiracy committed, attempted to commit, and caused to be committed, the overt acts described herein and all of those comprising the offenses charged in Counts Two through Six.

All in violation of Title 18, United States Code, Section 371.

2

**COUNT TWO**

Assault On a Federal Officer By Use of Deadly And Dangerous Weapon
(Title 18, United States Code, Sections 111(a)(1), (b) and 2)

On or about April 12, 2014, in the State and Federal District of Nevada, and elsewhere,

**CLIVEN D. BUNDY,**

defendant herein, aided and abetted by others, did use a dangerous and deadly weapon to forcibly assault, resist, oppose, impede, intimidate, and interfere with federal law enforcement officers while they were engaged in, and on the account of, the performance of their official duties, to wit: guarding and protecting government personnel and equipment located at the Impoundment Site at or near Bunkerville, Nevada, while executing federal court orders to remove cattle from the federal public lands, as described herein.

All in violation of Title 18, United States Code, Sections 111(a)(1) and (b), 1114, and 2.

**COUNT THREE**

Use and Carry of a Firearm in Relation to a Crime of Violence
(Title 18, United States Code, Sections 924(c) and 2)

On or about April 12, 2014, in the State and Federal District of Nevada, and elsewhere,

**CLIVEN D. BUNDY,**

defendant herein, aided and abetted by others, did knowingly use and carry firearms, which were brandished, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, assault on a

federal law enforcement officer, in violation of Title 18, United States Code, Section 111(b), as charged in Count Two of this Complaint.

All in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii) and 2.

### COUNT FOUR
Interference with Commerce by Extortion
(Title 18, United States Code, Sections 1951 and 2)

On or about April 12, 2014, in the State and Federal District of Nevada, and elsewhere,

### CLIVEN D. BUNDY,

defendant herein, did obstruct, delay and affect commerce, and attempt to obstruct, delay and affect commerce, and the movement of articles and commodities in such commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, in that defendant **BUNDY** attempted to obtain approximately 400 head of impounded cattle at or near Bunkerville, Nevada, from the care, custody, and possession of the Special Agent in Charge of impoundment operations on federal public lands at or near Bunkerville, Nevada, their consent having been induced by the wrongful use of force, fear, and violence as described herein.

All in violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT FIVE
Use and Carry of a Firearm in Relation to a Crime of Violence
(Title 18, United States Code, Sections 924(c) and 2)

On or about April 12, 2014, in the State and Federal District of Nevada and elsewhere,

**CLIVEN D. BUNDY,**

defendant herein, aided and abetted by others, did knowingly use and carry firearms, which were brandished, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, extortion by force, fear and violence, in violation of Title 18, United States Code, Section 1951, as charged in Count Four of this Complaint.

All in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii) and 2.

## COUNT SIX
Obstruction of the Administration of Justice
(Title 18, United States Code, Sections 1503 and 2)

On or about April 12, 2014, in the State and Federal District of Nevada,

**CLIVEN D. BUNDY,**

defendant herein, aided and abetted by others, did corruptly, and by threats and force, and by threatening communications, influence, obstruct and impede, and attempt to influence, obstruct and impede, the due administration of justice, in that the defendant threatened force and violence and used force and violence to impede, obstruct, and thwart the execution of federal court Orders by assaulting and extorting federal officers at the Impoundment Site near Bunkerville, Nevada, as described herein.

All in violation of Title 18, United States Code, Sections 1503 and 2.

5

In support of probable cause of the aforementioned charges, I state as follows.

1.     I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for over 12 years and, since November 2009, I have been assigned to the Las Vegas Field Office.   My training in law enforcement includes agency specific training in all aspects of conducting federal criminal investigations, including the planning, preparation, and execution of search warrants and criminal complaints.   I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), authorized to make arrests and conduct investigations in connection with alleged violations of federal law.  Over the course of my career, I have led or participated in numerous federal investigations to include the drafting and execution of search warrants and criminal complaints.

2.     I am currently assigned to conduct an investigation into events that occurred in and near Bunkerville, Nevada, during April 2014 in connection with a cattle impoundment operation conducted by federal law enforcement officers.   I submit that the evidence adduced during the investigation to date establishes probable cause to believe that, at all times relevant to the Complaint:

**SUMMARY**

3.     Defendant Cliven D. **BUNDY** ("**BUNDY**") was a resident of Bunkerville, Nevada, and the operator of a ranch referred to as "Bundy Ranch." His ranching operations included grazing cattle unlawfully on federal public land.

4.     On April 12, 2014, **BUNDY** and his co-conspirators organized and led a massive armed assault against federal law enforcement officers in and around Bunkerville, Nevada, in order to extort the officers into abandoning approximately 400 head of cattle that were in their lawful care and custody. In addition to conspiring among themselves to plan and execute these crimes, **BUNDY** and his confederates recruited, organized, and led hundreds of others in using armed force against law enforcement officers in order to achieve their criminal objectives.

5.     One of the conspiracy's objectives was to thwart the seizure and removal of defendant **BUNDY**'s cattle from federal public lands.  **BUNDY** had trespassed his cattle on federal public lands for over 20 years, refusing to obtain the legally-required permits or pay the required fees to keep and graze his cattle on the land.

6.     Since 1998, **BUNDY** was under federal Court Order to remove his trespass cattle, an Order **BUNDY** refused to recognize or follow.  In 2013, a federal court issued two more Orders for removal, each declaring that, in keeping with the law, the United States was authorized to seize and remove the cattle from the land in the event **BUNDY** refused to do so.  **BUNDY** refused.

7.     The removal operation began on April 5, 2014.  While it was ongoing, **BUNDY** and his co-conspirators used deceit and deception to recruit others to help

7

them to force BLM to stop operations, flooding the internet with false and deceitful images and statements to the effect that law enforcement officers were abusing **BUNDY** and stealing his cattle.   Deliberately lying, **BUNDY** and his co-conspirators pleaded for others to travel to Nevada to "stop the abuse" by "making a show of force against [the officers]" in order "to get them to back down" and "return the cattle."   By the morning of April 12, hundreds of people, many armed with assault rifles and other firearms, had traveled to Bunkerville, becoming **BUNDY**'s "Followers," conspiring with, and aiding and abetting him and his co-conspirators to execute a plan to recover **BUNDY**'s cattle by force.

8.    On the morning of April 12, **BUNDY** organized his Followers and gave them the order to get the cattle, directing a crowd of hundreds to travel more than five miles to the site where the cattle were corralled.   One group of Followers kept law enforcement officers occupied at the main entrance of the site by threatening to enter there, while another group – ultimately consisting of more than 200 Followers led by Co-conspirator 2 – assaulted the site from below, converging on its most vulnerable point: a narrow entrance located in a wash that ran under highway bridges.   Seeing the assault unfold, the officers responded to the wash to prevent entry.

9.    The 200 Followers in the wash included a significant number brandishing or raising their assault rifles in front of the officers.   Some of these gunmen took tactically superior positions on high ground, while others moved in and out of the crowd, masking their movements behind other unarmed Followers. The most immediate threat to the officers came from the bridges where gunmen

took sniper positions behind concrete barriers, their assault rifles aimed directly at the officers below.

10.     Having seized the tactical advantage, Co-conspirator 2 and the 200 Followers pressed forward to and against the wash entrance, demanding that the officers leave and abandon the cattle, threatening to enter by force if the officers did not do so.  Outnumbered by more than 4:1, unwilling to risk harm to children and other unarmed bystanders who had accompanied the Followers, and wishing to avoid the firefight that was sure to follow if they engaged the snipers on the bridge who posed such an obvious threat to their lives, the officers had no choice and were forced to leave and abandon the cattle to **BUNDY** and his co-conspirators, who promptly released and returned the cattle to **BUNDY**.

11.     Thereafter, the conspirators organized armed security patrols and checkpoints in and around **BUNDY**'s property to deter and prevent any future law enforcement actions against **BUNDY** or his co-conspirators and to protect his cattle from future removal actions, cattle he continued to hold, graze and keep on federal public lands unlawfully and continues to do so as of the date of this Complaint.

## TERMS AND DEFINITIONS

12.     "Federal public land" or "public land" was land owned by the United States and managed through various agencies of the United States, including, among others, the United States Department of Interior, Bureau of Land Management ("BLM") and National Park Service ("NPS").

13.     The BLM and NPS employed Rangers, Officers, and Special Agents to enforce federal laws and regulations on public land under their management.

9

14.     BLM and NPS Rangers, Officers, and Special Agents were "federal law enforcement officers" under Title 18, United States Code, Section 115(c)(1), that is, they were officers, agents, and employees of the United States authorized by law to engage in or supervise the prevention, detection, investigation, or prosecution of any violation of federal criminal law.

15.     The Bunkerville Allotment ("the Allotment") was an area of federal public land near Bunkerville, Nevada, under the management of BLM. The United States has owned the land comprising the Allotment since 1848, when it was acquired from the nation of Mexico under the Treaty of Guadalupe Hidalgo, and has never relinquished ownership.

16.     The Lake Mead National Recreational Area ("LMNRA") was an area of federal public land located near or adjacent to the Allotment, under the management of the NPS.  The United States has owned the land comprising the LMNRA since 1848, when it was acquired from the nation of Mexico under the Treaty of Guadalupe Hidalgo, and has never relinquished ownership.

## BUNDY TRESPASSED CATTLE ON PUBLIC LAND AND REFUSED TO COMPLY WITH FOUR COURT ORDERS TO REMOVE THEM

17.     Federal law required a rancher to obtain a grazing permit from the BLM and to pay fees to the United States to graze cattle on the Bunkerville Allotment.  Grazing cattle without a permit constituted a trespass on public land.

18.     From 1993 to the date of this Complaint, **BUNDY** knowingly refused to pay fees or obtain permits as he kept and grazed his cattle on the Allotment year-round, constituting a continuing trespass on public land.

19. In 1998, and because of **BUNDY**'s continuing trespass, the United States District Court for the District of Nevada (hereinafter "District Court" or "Federal Court") Ordered **BUNDY** to remove his cattle permanently from the Allotment. **BUNDY** deliberately ignored the Order and continued to trespass by keeping and grazing his cattle unlawfully on public land.

20. In 1999, the District Court fined **BUNDY** for each day he refused to remove his cattle. **BUNDY** refused to pay the fines and continued to trespass by keeping and grazing his cattle unlawfully on public land.

21. By 2012, **BUNDY**'s herd had multiplied substantially and spread into the LMNRA where BUNDY kept and grazed them year-round, refusing to pay fees or obtain permits, constituting a continuing trespass on public land.

22. In 2013, the District Court issued two Orders. One ordered **BUNDY** to remove his trespass cattle permanently from the LMNRA and the other re-affirmed the 1998 and 1999 Orders that required him to remove his cattle permanently from the Allotment. Both Orders declared that, in keeping with the law, the United States was authorized to seize and remove **BUNDY**'s trespass cattle if he did not comply with the Court's Orders. One of the Orders expressly stated that **BUNDY** was "not to interfere" with any removal.

23. **BUNDY** ignored the Orders and continued to keep and graze his trespass cattle unlawfully on public land.

## THE BLM PLANNED TO SEIZE AND REMOVE THE CATTLE
## FROM THE PUBLIC LANDS PURSUANT TO COURT ORDERS

24.     In keeping with the law and the 2013 federal court Orders, the BLM planned to seize and remove **BUNDY**'s trespass cattle, following well-established rules and regulations governing this procedure, referred to hereinafter collectively as "impound" or "impoundment."

25.     A preliminary survey revealed that the BLM would have to impound almost 1,000 head of trespass cattle scattered over hundreds of thousands of acres of arid and difficult terrain.   Given these circumstances, BLM estimated that it would take a month or more to complete the impoundment.

26.     It was part of the plan that BLM would establish a base of operations (hereinafter referred to as "the Impoundment Site") located on the public lands near Bunkerville, about 7 miles away from Bundy Ranch in an area commonly referred to as the Toquop wash.

27.     It was part of the plan that on February 17, 2014, the BLM entered into a contract with a civilian contractor in Utah to round-up and gather the trespass cattle.   The contract required the contractor to bring people and equipment to Nevada to conduct impoundment operations.

28.     It was part of the plan that the civilian contractor and crew would gather and move the trespass cattle from public land into corrals at the Impoundment Site where they would be held until such time as they could be further transported.

29.     It was part of the plan that on March 20, 2014, BLM entered into a contract for the services of an auctioneer in Utah.   The contract required the trespass cattle to be trucked from the Impoundment Site in Nevada to the contract auctioneer in Utah, who would then sell them at public sale.

30.     It was part of the plan that BLM would use BLM and NPS Rangers, Officers, and Special Agents to provide security for impoundment operations, including securing the cattle at the Impoundment Site and protecting the civilian contractors and government employees engaged in impoundment operations.

31.     It was part of the plan that BLM designated the Special Agent-in-Charge of BLM's Nevada and Utah region (hereinafter the "SAC") to lead impoundment operations.

## BUNDY THREATENED TO "DO WHATEVER IT TAKES" TO PREVENT THE IMPOUNDMENT OF HIS CATTLE

32.     On October 23, 2012, and in connection with legal proceedings culminating in the 2013 Court Orders, **BUNDY** threatened to interfere with any impoundment by stating that he "would do whatever it takes" to stop the impoundment.  When asked whether that included soliciting support from others to help him, **BUNDY** responded: "Yes."

33.     On March 14, 2014, the BLM formally notified **BUNDY** that impoundment operations would take place.

34.     On March 15, 2014, **BUNDY** threatened to interfere by stating publically that he "[was] ready to do battle" with the BLM and he would "do whatever it takes" to protect "his property."

35.     On March 17, 2014, a BLM Special Agent notified one of **BUNDY**'s adult sons that the Special Agent was available to answer any questions about the impoundment operation.  **BUNDY**'s son became angry and threatened to interfere, stating that he and his family would "do whatever it takes" and he would "have several hundred" with him to prevent the BLM from removing the trespass cattle. When asked whether his use of "whatever it takes" included physical force or violence, **BUNDY**'s son replied: "I will do whatever it takes; you interpret that the way you want."

36.     On March 24, 2014, **BUNDY** threatened to interfere, stating publically that he intended to "organize lots of groups" to "come from hundreds of miles away" and he was in a "range war" with BLM that could "last a long time."

37.     On March 25, 2014, **BUNDY** threatened to interfere, stating publically that: "BUNDY's ready . . . whenever [the federal government's] got the guts to try it . . tell them to come . . . I'll do whatever it takes."

38.     On March 28, 2014, **BUNDY** threatened to interfere, stating publically that: "all of those cowboys are going to be thieves who steal my cattle . . . [i]t's like they're staging for a war . . . I told them I'd do whatever it takes . . . I'll stick with that."

### BUNDY CARRIED OUT HIS THREATS BYCONSPIRING TO LIE, THREATEN FORCE AND VIOLENCE AND USE FORCE AND VIOLENCE

**A.      Object and Nature of the Conspiracy.**

39.     The scope, nature, and objects of the conspiratorial agreement were to use threats of force and violence and actual force and violence to: (1) impede,

14

Case 2:16-mj-00127-PAL   Document 1   Filed 02/11/16   Page 15 of 32

obstruct and interfere with BLM's impoundment operation; (2) obtain BUNDY's impounded cattle from federal law enforcement officers; (3) threaten, intimidate and prevent by force federal law enforcement officers from taking action against the conspirators; and (4) threaten, intimidate and prevent by force federal law enforcement officers from taking law enforcement actions against **BUNDY** and his co-conspirators and prevent by force BLM from exercising regulatory and law enforcement authority over the public lands.

40.     In order to achieve the objects of the conspiracy, **BUNDY** conspired, confederated, and agreed to commit numerous federal offenses, as charged herein.

**B.    Manner and Means of the Conspiracy.**

41.     To achieve his objectives, **BUNDY** and his co-conspirators recruited, organized, and led a force of hundreds of people to threaten and use force and violence to prevent the law enforcement officers from discharging their duties and to coerce their consent to abandon the cattle that were, pursuant to court order, lawfully in their care and custody and which they were duty bound to protect.

42.     As a part of the manner and means of the conspiracy, **BUNDY** and his co-conspirators, among other things:

a.     Used deceit and deception to knowingly recruit Followers, that is, to encourage, counsel, and incite others to travel to Bundy Ranch for the unlawful purposes of interfering with impoundment operations, obstructing the execution of federal court orders, and using force and violence against federal law enforcement officers while they were performing their duties.

b.     Used the internet and other facilities in interstate commerce to

knowingly broadcast false, deceitful, and deceptive images and messages for the purpose of recruiting Followers.

c.     Used the internet and other facilities in interstate commerce to encourage, counsel, and incite Followers to bring guns to Bundy Ranch for the unlawful purposes of interfering with impoundment operations, obstructing the execution of federal court orders, and using force and violence against federal law enforcement officers to prevent them from discharging their duties.

d.     Traveled in interstate commerce and used other facilities in interstate commerce to threaten force, violence, and economic harm to private contractors providing services to the BLM during impoundment operations.

e.     Threatened and used force and violence against BLM civilian employees engaged in impoundment operations for the purpose of obstructing the execution of federal court orders and interfering with impoundment operations.

f.     Counseled, incited, and led Followers to use, carry, brandish, and aim firearms, including assault rifles, for the purpose of assaulting federal law enforcement officers.

g.     Counseled, incited, and led Followers to use, carry, brandish, and aim firearms, including assault rifles, for the purpose of extorting federal law enforcement officers.

h.     Organized Followers into body guards, armed patrols, and security checkpoints for the purpose of using threats, force, violence, and intimidation to protect the conspirators, prevent law enforcement actions against the conspirators, prevent the execution of federal court orders, and prevent law

enforcement officers from discharging their duties.

**C.     Roles of the Conspirators.**

43.     **BUNDY** was the leader, organizer, and chief beneficiary of the conspiracy, possessing ultimate authority over the scope, manner, and means of conspiratorial operations and receiving the economic benefits of the extortion.

44.     **BUNDY** and Co-Conspirators 1, 2, 3, and 4 were leaders and organizers of the conspiracy who, among other things: recruited Followers; interfered with impoundment operations through threats and use of force and violence; interfered with impoundment operations by attempting to extort BLM contractors; led an armed assault against federal law enforcement officers; delivered extortionate demands to law enforcement officers; and extorted federal law enforcement officers.   Co-Conspirators 1, 2, 3, and 4 have been arrested and are detained on federal charges lodged in another district.

**D.     Overt Acts in Furtherance of the Conspiracy.**

49.     It was a part of the conspiracy that from March 28 to April 11, 2014, and for the purpose of carrying out the objects of the conspiracy, **BUNDY** and his co-conspirators performed, or caused to be performed, the following overt acts, among many others.

**1.     March 28 to April 11:  The Conspirators Interfered with Impoundment Operations and Used Deceit and Deception to Recruit Followers.**

50.     On or about March 28, 2014, **BUNDY** and others working with him, blocked a convoy of vehicles carrying horses and equipment intended for use in impoundment operations, confronting and threatening civilian contractors,

endangering the safety of the personnel in the convoy, and interfering with impoundment operations.

51.   Shortly thereafter, and in an effort to recruit Followers, **BUNDY** caused the broadcast of a video of the confrontation with the contractors entitled "Range War," depicting images captured during the confrontation, combining them with false, deceitful and deceptive statements to the effect that the BLM was stealing **BUNDY**'s cattle.

52.   On or about April 2, 2014, Co-conspirator 1 traveled from Nevada to Utah to threaten force, violence, and economic harm to the contract auctioneer providing services to the BLM, by, among other things, entering upon the contractor's property for the purpose of interfering with business operations, threatening and intimidating customers and employees, interfering with business operations, and threatening to shut down the business if the contractor fulfilled his contractual obligations with BLM.

53.   On or about April 5, 2014, **BUNDY** threatened force and violence against federal law enforcement officers by publically stating, among other things: "I've done quite a bit so far to keep my cattle, but I guess it's not been enough . . . they took 75 of my cattle today . . . I have said I'd do what it takes to keep my cattle so I guess it is going to have to be more physical."

54.   On or about April 6, 2014, co-conspirator 1 and another conspirator interfered with impoundment operations by positioning themselves to block a BLM convoy and refusing to leave the area when asked to do so.  Failing to leave after repeated requests, a co-conspirator was arrested by law enforcement officers.

55.   Shortly thereafter, **BUNDY** caused images of the arrest to be broadcasted over the internet, combining them with false, deceitful and deceptive statements to the effect that the BLM supposedly: employed snipers against Bundy family members; used excessive force during the arrest; and arrested a conspirator for exercising his First Amendment rights.

56.   On or about April 7, 2014, Co-conspirator 2 traveled from Arizona to the Bundy Ranch in Nevada.

57.   On or about April 7, 2014, Co-conspirator 3 in Montana, contacted **BUNDY** in Nevada, by telephone.

58.   On or about April 7, 2014, Co-conspirator 3, who referred to himself as a leader of a network he referred to as Operation Mutual Aid ("OMA"), used the internet and other facilities in interstate commerce to recruit others whom Co-conspirator 3 referred to as "militia" belonging to the OMA network. Attempting to incite the so-called OMA "militia" members to travel to Bundy Ranch for unlawful purposes, Co-conspirator 3 falsely, deceptively, and deceitfully stated, among other things, that the ranch was surrounded by BLM snipers, the Bundy family was isolated, and BLM wanted **BUNDY** dead.

59.   On or about April 7, 2014, **BUNDY** and others working with him established a site only minutes travel distance from the Bundy Ranch along Nevada State Route 170, a state road that also served as the main route between the Impoundment Site and the public land where impoundment operations were taking place. Strategically located between the Impoundment Site and various ingress and egress points to public land, the location of the site served as both a natural vantage

point from which to observe impoundment operations and a potential choke-point for disrupting BLM convoys. Conspicuous for, among other things, a stage and two tall flagpoles, one of which flew the Nevada State flag above the flag of the United States, this site (hereinafter referred to as "the Staging Site") served as a base of operations from which the conspirators made speeches, received and organized Followers as they arrived at Bundy Ranch, and gathered and organized Followers before initiating their assaults on federal law enforcement officers.

60.     On or about April 8, 2014, Co-conspirator 4 in California, contacted **BUNDY** in Nevada, by telephone.

61.     On or about April 8, 2014, Co-conspirator 4 and **BUNDY** broadcasted messages over the internet.  Using deceit, deception, and threats to incite others to travel to Bundy Ranch for unlawful purposes, **BUNDY** told listeners, among other things, that: "they have my house surrounded . . . the federal government is stealing my property . . . [the BLM] are armed with assault rifles . . . they have snipers . . . I haven't called no militia but, hey, that looks like where we are . . . there is a strong army out here . . . we are going to have to take our land back . . . somebody is going to have to back off . . . we the people will put our boots down and walk over these people . . . they are up against a man who will do whatever it takes."

62.     In that same broadcast, Co-conspirator 4 used threats to incite listeners to travel to Bundy Ranch for unlawful purposes, telling listeners, among other things, that: "if this is not the issue right now where we stand and fight to the absolute death there is no other option; the federal government must get out of the State of Nevada . . . if they don't want it to be peaceful it is by their choice. . . I'm

calling on all Americans anywhere in the vicinity of Clark County, Nevada . . . if you're in Nevada and can legally carry, get weapons out there, o.k. . . . we are going to stand and fight in Clark County, Nevada . . . they will leave or else."

63.    On or about April 8, 2014, Co-conspirator 3 sent a message from Montana to Pennsylvania to another person who referred to himself as one of the leaders in OMA, stating, among other things, that it was "time to invite everyone to the first annual Patriots (sic) Picnic at the Bundy Ranch" and telling the OMA leader that the Bundys "still want help."

64.    On or about April 8, 2014, and for the purpose of recruiting Followers, Co-Conspirator 3 sent a message over the internet, stating that Co-Conspirator 3 had spoken with BUNDY and that "he knows we're coming and has opened his land up to everyone willing . . . OMA is moving . . . not going public with this until more are enroute."

65.    On or about April 8, 2014, Co-conspirator 3 caused an email to be sent to OMA members stating: "we have made the decision to mobilize in Nevada, units are underway as I type this  . . . the feds arrested some protestors today, and the words 'we need you now' were uttered . . . we have approximately 150 responding, but that number is [gr]owing by the hour." The message provided directions and grid coordinates to Bundy Ranch.

66.    On or about and between April 8 and 9, 2014, Co-conspirator 4 traveled from California to Bundy Ranch in Nevada.

67.    On or about and between April 8 and 9, 2014, Co-conspirator 3 traveled from Montana to Bundy Ranch in Nevada.

68.     On or about April 9, 2014, Co-conspirators 3 and 4 met with **BUNDY** and other conspirators at Bundy Ranch.

69.     On the morning of April 9, 2014, Co-conspirator 4 met with the SAC and stated that he was acting as a liaison between Bundy Followers and the BLM. Threatening the SAC, Co-conspirator 4 stated: "What are you guys going to do if 10,000 people show up? . . . Are you prepared for this? . . . I don't believe in firing a single bullet unless in absolute defense and it's legal and constitutional."

70.     On or about April 9, 2014, and for the purpose of inciting others to travel to Bundy Ranch for an unlawful purpose, the conspirators caused a message to be broadcasted over the internet, stating: "The Bundy family has requested help from militia groups including Operation Mutual Aid, 3 Percenters club, freedom fighters, and other operations to come and stand with us and regain our rights and freedom."

71.     On April 9, 2014, and for the purpose of inciting others to travel to Bundy Ranch for an unlawful purpose, Co-conspirator 4 broadcasted a message over the internet, stating, among other things: "the BLM knows if they are outnumbered and outgunned . . . they will stand down . . . we want BLM to get out of the state of Nevada . . . I fully expect the standoff will occur when thousands go to repossess the rightfully owned property of the Bundys . . . we need strength in numbers."

72.     On or about April 9, 2014, Co-conspirator 1, and others working with him, traveled for a second time from Nevada to Utah to threaten force, violence, and economic loss to the contract auctioneer providing services to the BLM by, among other things: intimidating customers; interfering with business operations; and

instilling fear and apprehension in customers and employees.

73.     On or about April 9, 2014, and for the purpose of inciting others to travel to Bundy Ranch for an unlawful purpose, Co-conspirator 4 broadcasted a message over the internet, stating, among other things: "now is the time to show up for something like this . . . we need ten thousand people to come here . . . I only have one fear is that people that don't respond to this call . . . it's time to make a stand against tyranny . . . we need to let everyone know that BLM has zero authority."

74.     On April 9, 2014, Co-conspirators 2 and 4 assaulted federal officers by, among other things: intercepting and blocking a convoy of BLM vehicles engaged in impoundment operations; colliding an ATV into a truck in the convoy in order to stall the truck and gain entry by force; attempting to forcibly gain entrance to the stalled truck; attempting to throw a rock at law enforcement officers while the officers were protecting the truck and the civilian passengers inside; threatening physical harm to law enforcement officers while they were protecting the truck and the civilian passengers inside; and causing physical contact with an officer while the officer was engaged in protecting the truck and the civilian passengers inside.

75.     On or about April 9, 2014, and for the purpose of inciting others to travel to Bundy Ranch for an unlawful purpose, Co-Conspirator 4 broadcasted a message over the internet, stating, among other things:  "we were serious about stopping the convoy . . . [the BLM] were caught off guard and tried to push past us . . . they couldn't do it . . . we outnumbered them and they retreated . . . we know how they will come back after they retreat . . . my biggest fear is if we don't respond . . . they retreated and will come back with a bigger force . . . we need to disperse them

with tens of thousands . . . we want BLM to always retreat because we will always

outnumber them . . . we have all been waiting for that ultimate moment . . . there is

so much at stake . . . we can win with numbers . . . I've got people coming from

Michigan . . . militia members who are fully armed are here . . . it's good to watch

the BLM with its tail between its legs . . . get out here . . . this is going to get

exciting . . . ultimately get the feds to leave."

76.     On April 10, 2014, and for the purpose of inciting others to travel to

Bundy Ranch for an unlawful purpose, Co-conspirator 3 caused an email to be sent

to self-described "militia" members of OMA under the subject line "Bundy

Objectives," as follows:

> Nevada Alert!  We are requesting help to distribute the following to
> any and all media, blog, patriot groups etc.
>
> 1.     Secure the Bundy family from government incursion which
> includes protection of all personnel responding in support of the
> Bundys ie. Protestors, extended family, and friends.
>
> 2.     To return the confiscated Clark County Nevada property
> currently blocked by federal personnel to it's (sic) rightful stewards,
> the people of Clark County, Nevada.
>
> 3.     To secure and return to Mr. Bundys (sic) ranch the mounting
> number of cattle which have been confiscated by BLM agents and
> private contractors.
>
> These objectives are in cohesion with Cliven Bundy and the Bundy
> ranch . . . .

77.     On or about April 10, 2014, and for the purpose of inciting others to

travel to Bundy Ranch for an unlawful purpose, Co-conspirator 4 broadcasted a

message over the internet, stating, among other things: "there is not enough militia

here . . . we have 1000's of very organized constitutional militia . . . they are

trickling in . . . where we will fail is for us not to at least match the overwhelming force . . . we have about 50 members here now . . . where we will fail is for us not to not match the BLM force . . . we need a show of force . . . we did a recon and found that BLM have hundreds of vehicles . . . BLM needs to vacate immediately . . . we need the numbers for the feds to leave . . . they will come back with a bigger force . . . we need tens of thousands of people so they retreat . . . come out here . . . we've all been waiting for the ultimate moment . . . we can win with numbers . . . get out here no matter where you are . . . militia members here are fully armed."

78.   On or about April 10, 2014, and for the purpose of inciting other to travel to Bundy Ranch for an unlawful purpose, Co-conspirator 4 broadcasted a message over the internet, stating, among other things: "there is a court order, but the court is corrupt . . . BLM believes they are acting constitutionally . . . BLM is in violation of every God-given right of every human being . . . [BLM's] closure orders are 'shelter in place'. . . [BLM] aimed AR-15's at me [during confrontation on April 9] . . . Waco and Ruby Ridge was a show of force by government and violated sovereign rights . . . if we have 10,000 people, [the BLM] will have to get past us."

79.   On the morning of April 11, 2014, Co-Conspirator 4 met with the SAC and stated, among other things: "we are going to have a face-to-face confrontation . . . we have thousands of people . . . we are going to come here and it is non-negotiable . . . if that comes about, we want to make sure that any [BLM officer] who wants to stand down will not be retaliated against . . . this is non-negotiable . . . if you make the decision to go face-to-face and someone gets hurt we are going to hold you responsible . . . tell D.C. that the justification for this is from a corrupt

court . . . I'm relaying a message . . . if anyone is acting unconstitutionally they will be arrested . . . I came here to allow you to prevent a scenario where someone gets hurt."

80.     By on or about April 11, 2014, hundreds of Followers traveled to Nevada, many armed with assault rifles and other firearms and many of whom identified themselves as "militia" and wore military style clothing and equipment.

81.     By on or about April 11, 2014, Co-conspirator 3 and others working with him, received the armed Followers, including those who identified themselves as "militia." The leaders of the conspiracy placed them into camps, which the leaders described as "militia camps," from which camps the conspirators would organize and deploy the militia and other armed Followers.

82.     By on or about April 11, 2014, Co-conspirator 3, and others working with him, organized armed Followers and militia into patrols and armed checkpoints to provide security to the conspirators and their criminal enterprise.

**2.     April 12: The Conspirators Assaulted and Extorted Law Enforcement Officers.**

83.     It was further a part of the conspiracy that on April 12, 2014, **BUNDY** and his co-conspirators, organized, led and executed a mass assault on federal law enforcement officers in order to obtain the seized cattle, as follows.

84.     By the morning of April 12, the BLM had seized approximately 400 head of cattle and had them corralled at the Impoundment Site, awaiting further shipment out of the state of Nevada.

85.     On the morning of April 12, **BUNDY** led a rally of hundreds of his

26

Followers, including militia and other armed Followers, at the Rally Site where he told them that "God [is] going to be with us" and that it was time "to take our land back." He then commanded his Followers to get the cattle.

86.    **BUNDY** directed his Followers that "horse people" (Followers riding horses) would leave the Rally Site and travel a dirt road to the Toquop wash, the location of the Impoundment Site, a distance of about 3.5 miles.  While that was happening, so commanded **BUNDY**, the other Followers, including militia and other armed Followers, were to travel the highway by vehicle, a distance of about 5 miles, and "shut down the freeway" at the Impoundment Site.  The Followers, so directed **BUNDY**, were then to meet with the "horse people" in the Toquop wash.

87.    The Followers did as **BUNDY** ordered.  Armed with their weapons, the Followers hurriedly loaded themselves into cars and trucks and moved *en masse* to the Impoundment Site, jamming the roads and slowing traffic on northbound I-15 to a trickle, making it difficult for state and local law enforcement vehicles to respond. When the Followers arrived at the Impoundment Site, they jumped out of their vehicles and many of them moved quickly on foot to a position across from the main entrance.

88.    Other Followers took positions on the bridges overlooking the Impoundment Site.  The few local law enforcement officers who were able to respond formed a human line in the I-15 median to block the Followers, many of whom carried and brandished assault rifles, from entering at the main entrance to the Impoundment Site.

89.    Many Followers then moved a few hundred yards east and below the

main entrance and met Co-conspirator 2 in the Toquop wash, gathering about 150 yards opposite from a makeshift metal rail gate that blocked the wash entrance beneath the southbound bridge of I-15.

90.     By 12:00 noon, over 400 of **BUNDY**'s Followers had converged upon the Impoundment Site, many of the Followers were comprised of Bundy's militia openly brandishing assault rifles, others bearing side arms, the combined group grossly outnumbering the officers that protected the site.  About 60 yards across from the metal rail gate at the wash entrance to the site, between the north and southbound I-15 bridges, a crowd of more than 270 Followers – a combination of militia and non-militia on foot and about 40 men and women on horseback – formed into a line along the bottom of the wash about 60 yards across.  This position was guarded by about 50 federal law enforcement officers, positioned beginning about 15 to 20 yards behind the gate.

91.     The officers at the gate were dangerously exposed.  They were in the open on low ground at the bottom of the wash, below highway bridges that towered more than 40 feet above them and surrounded on the sides by steep embankments of high ground. The terrain acted like a funnel with them at the bottom and no natural cover or concealment to protect them from the gunmen on the high ground, their only protection being their body armor and the vehicles they happened to drive to the gate. At this point approximately 40 Followers were either carrying or brandishing firearms in front of the officers, many of them moving in and out of the line, taking high ground on the sides of the wash. Meanwhile, more than 20 Followers carried or brandished firearms while on the bridges that towered move

than 40 feet above the officers, some of them aiming assault rifles at the officers

from covered and concealed sniper positions.

92.    The officers guarding the gate could readily observe gunmen bobbing

up and down from behind the concrete barriers that bordered the northbound I-15

bridge, indicating to the officers that the gunmen were acquiring, and determining

the range to, their officer-targets.  The officers could also observe armed gunmen

dressed in military-style tactical gear and wearing body armor, moving in and

among the unarmed Followers, using them as human shields to mask their

movements while still others took tactically superior positions on the sides of the

wash.

93.    The Followers' close proximity to the officers, their array and

formation in the wash, their refusal to disperse upon command, their angry taunts,

their numbers carrying or brandishing firearms, their movement to the gate while

brandishing assault rifles and wearing body armor, and their superior sniper

positions on the bridge above, all caused the officers to fear immediate bodily harm

or death.

94.    Around 12:15, the Followers in the wash, led by Co-conspirator 2,

advanced to the gate.  The gunmen moved with him, openly brandishing their rifles

and taking over-watch positions on the high ground within full view of the tactically

disadvantaged officers, the snipers in concealed positions on and under the bridges

now aiming their assault rifles at the officers.  Seeing the combined force arrayed

against them – an organized crowd of more than 400, more than 60 among the

crowd carrying or brandishing rifles or pistols, 40 supporters on horseback, militia

snipers concealed on the bridges above them with their rifles zeroed-in on the officers, militia gunmen intermingled with the crowd using the unarmed people to shield their movement, militia gunmen in over-watch positions on the high ground – the officers believed they were going to be shot and killed. They were stymied – prevented from shooting the gunmen who posed such an obvious threat to their lives out of concern they would spark a firefight that would kill or injure unarmed people. Unable to surgically remove the deadly threats before them, outnumbered, outgunned, and located in a dangerously exposed and tactically inferior position, the officers knew they were easy targets. They still held their ground.

95.    Upon reaching the gate and backed by his gunmen and snipers, Co-conspirator 2 told the SAC that he and the rest of his force would not leave until the BLM left the impoundment site. When asked to move his gun-backed crowd away from the gate so the officers could disengage, Co-conspirator 2 refused and demanded that the officers leave first  stating, among other things, "You need to leave . . . that's the terms . . . no, you need to leave . . . you are on Nevada State property . . . the time is now . . . no, the time is now."

96.    To prevent the disaster that was sure to follow if they remained longer, the SAC was forced to give in to Co-conspirator 2's demands and ordered his officers to leave, abandoning the post, the impoundment site, and the cattle to **BUNDY**.

97.    Having made the decision to meet the conspirators' demands, the SAC met with Co-conspirator 1 near the main entrance to the Impoundment Site to negotiate the departure of the law enforcement officers. While the armed Followers held their positon below at the wash entrance, Co-conspirator 1 demanded that the

BLM officers pack all of the equipment and leave the Impoundment Site within two hours.

98.     The law enforcement officers were forced to abandon the Impoundment Site and the cattle to the conspirators and their Followers, who promptly released and returned them to **BUNDY** and took down the fences comprising the corrals.

    **3.**    **Continuing Conspiracy – Post-Assault: The Conspirators Organized Bodyguards, Patrols and Checkpoints to Prevent and Deter Future Law Enforcement Actions.**

99.     It was further a part of the conspiracy that following the April 12 assault and extortion, **BUNDY** and the co-conspirators took such other actions as necessary to protect themselves and their ill-gotten gains and to further interfere with and prevent future federal law enforcement actions on the public lands.

100.     From April 12 to at least the end of May 2014, the BUDNY and the co-conspirators established, organized, and maintained militia camps to provide housing and logistical support to armed gunmen who continued to travel to the Bundy Ranch.

101.     From April 12 to at least the end of May 2014, **BUNDY** and his co-conspirators established armed checkpoints and security patrols to prevent and deter law enforcement actions against the conspirators, including recovering the extorted cattle.

102.     From April 12, 2014 through September 2014, Co-Conspirator 4 made statements to the SAC, threatening similar assaultive conduct in the event the BLM attempted further law enforcement actions.

103.     From April 12, 2014 through the date of this Complaint, **BUNDY**

made public statements threatening that he would continue to interfere with federal law enforcement actions against him or the cattle.

104.    From April 12, 2014 through the date of this Complaint, **BUNDY** continued to employ body guards to protect him and other co-conspirators from federal law enforcement actions.

105.    From April 12, 2014, through the date of this Complaint, the **BUNDY** and his co-conspirators continue to take such actions as necessary to hold, protect, and prevent the impoundment of the extorted cattle and such other trespass cattle that are subject to the 2013 Court Orders.

Joel P. Willis
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me this 11th day of February 2016.

PEGGY A. LEEN
United States Magistrate Judge